# United States Court of Appeals
## For the Tenth Circuit
_____

Nos.  23-4059

MARTHA ELLIS,
Plaintiff-Appellee,

v.

SALT LAKE CITY CORPORATION, KARL LIEB, BRIAN DALE,
and ROBERT McMICKEN,
Defendants-Appellants.

Appeal from U.S. District Court, Central Division, District of Utah
The Honorable Jill N. Parrish, District Judge
District Court Case No. 2:17-cv-00245-JNP-JCB

_____

**APPELLEE'S CORRECTED BRIEF**

_____

**ORAL ARGUMENT NOT REQUESTED**

_____

Respectfully Submitted,
Luke Rosseel, Esq. (BBO # 690731)
ROSSEEL LAW
P.O. Box 1136
Berlin, Massachusetts  01503
(508) 471-6459
Luke@ROSSEELLAW.com
*Attorney for Plaintiff-Appellee*
*Martha Ellis*

**April 29, 2024**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF RELATED CASES ................................................... 1

FACTS RELEVANT TO THE ISSUES SUBMITTED FOR
REVIEW ............................................................................................... 2

    I.    Brian Dale Becomes Ms. Ellis's Supervisor, and Curtails
        her Ascendant Career ............................................................... 2

    II.   Ms. Ellis Reports Gender Discrimination and
        Retaliation, Several Co-Workers Substantiate her
        Reports, and the Defendants Continue to Discipline her
        without Cause ......................................................................... 12

    III.  Defendant Lieb Denies Ms. Ellis Further Leave, The
        Department Refuses Ms. Ellis's Request for
        Accommodations, and Defendant Lieb Terminates Ms.
        Ellis's Employment ............................................................... 20

SUMMARY OF THE ARGUMENT ................................................... 24

ARGUMENT ...................................................................................... 25

    I.    The District Court Properly Denied Qualified Immunity
        to the Individual Defendants ................................................. 25

        a. The Facts Found by the District Judge Show that
           Each Defendant Violated Ms. Ellis's Rights ................. 26

           i.   The District Judge's Findings Show that the
              Defendants Committed Disparate-Impact Sex
              Discrimination ....................................................... 26

           ii.  The District Judge's Findings Show that the
               Defendants Created a Hostile Working
              Environment .......................................................... 32

i

      b.  The Rights the Individual Defendants Violated were Clearly Established when those Violations took Place ............................................................................................48

II.  This Court Lacks Jurisdiction Over Most of the Defendants' Claims, which also Fail on the Merits ...............................53

      a.  Nothing in the Record Blatantly Contradicts the District Court's Findings, which are Well Supported ...............53

      b.  The Defendants' Title VII and *Monell* Claims Fail.......................61

           i.  The Defendants' Pendent-Jurisdiction Contentions Regarding the Title VII and *Monell* Claims Fail to Rise to the Level of Appellate Argument ................................................................61

          ii.  The Title VII and *Monell* Claims against the City are not Inextricably Intertwined with the Claims against the Individual Defendants.........................62

        iii.  The Title VII and *Monell* Claims against the City Succeed on their Merits ..................................................63

      c.  The Defendants' Evidentiary Claims Fail....................................64

           i.  The Defendants' Waived Evidentiary Claims are not Inextricably Intertwined with the Claims against the Individual Defendants.........................64

          ii.  The District Court did not Abuse its Discretion by ruling that the CSC Decision was Admissible under Fed. R. Evid. 803(8) ...............................65

CONCLUSION ................................................................................................69

CERTIFICATION OF COUNSEL .....................................................................71

CERTIFICATE OF SERVICE.............................................................................72

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Aetna Cas. & Sur. Co. v. Hunt,*
 486 F.2d 81 (10th Cir. 1973)......................................................................54

*Agassounon v. Jeppesen Sanderson, Inc.,*
 688 F. App'x 507, (10th Cir. 2017)..............................................................52

*Barrett v. Salt Lake Cty.,*
 754 F.3d 864 (10th Cir. 2014)......................................................................27

*United States v. The Boeing Co.,*
 825 F.3d 1138 (10th Cir. 2016)....................................................................65

*Bolden v. PRC Inc.,*
 43 F.3d 545 (10th Cir. 1994)........................................................................39

*Bronson v. Swensen,*
 500 F.3d 1099 (10th Cir. 2007)..............................................................61, 66

*Brown v. LaFerry's LP Gas Co.,*
 708 F. App'x 518 (10th Cir. 2017) (unpublished)..............................46, 52

*Chavez v. New Mexico,*
 397 F.3d 826 (10th Cir. 2005)................................................................33, 35

*Coleman v. Home Depot, Inc.,*
 306 F.3d 1333 (3d Cir. 2002)......................................................................68

*Cox v. Babcock & Wilcox Co.,*
 471 F.2d 13 (4th Cir. 1972).........................................................................69

*Cox v. Glanz,*
 800 F.3d 1231 (10thCir.2015)...............................................................61, 63

*Crawford-El v. Britton,*
 523 U.S. 574 (1998) ....................................................................................28

*Dalzell v. RP Steamboat Springs, LLC,*
    781 F.3d 1201 (10th Cir. 2015)....................................................................54

*Davidson v. Am. Online, Inc.,*
    337 F.3d 1179 (10th Cir. 2003)....................................................................32

*Denny v. Hutchinson Sales Corp.,*
    649 F.2d 816 (10th Cir. 1981).....................................................................66

*Durand v. Shull, No. 21-1180,*
    2022 WL 1184041(10th Cir. Apr. 21, 2022) (unpublished)...............43, 44

*E.E.O.C. v. Ford Motor Co.,*
    98 F.3d 1341, 1996 WL 557800 (6th Cir. 1996) (unpublished)
    .........................................................................................................................69

*Est. of B.I.C. v. Gillen,*
    761 F.3d 1099 (10th Cir. 2014)....................................................................49

*Est. of Booker v. Gomez,*
    745 F.3d 405 (10th Cir. 2014).....................................................................49

*Ford v. Jackson Nat'l Life Ins. Co.,*
    45 F.4th 1202 (10th Cir. 2022) .............................................................27, 30

*Ford v. West,*
    222 F.3d 767 (10th Cir. 2000).................................................................42, 59

*Fye v. Oklahoma Corp. Comm'n,*
    175 F. App'x 207 (10th Cir. 2006) (unpublished) ...................................51

*Hicks v. Gates Rubber Co.,*
    833 F.2d 1406 (10th Cir. 1987)....................................................................47

*Hindman v. Thompson,*
    557 F. Supp. 2d 1293 (N.D. Okla. 2008) ...................................................49

*Hubbard v. Nestor,*
    830 F. App'x 574 (10th Cir. 2020) .............................................................28

*Jaramillo v. Colorado Jud. Dep't,*
    427 F.3d 1303 (10th Cir. 2005) ............................................................. 30, 31

*Johnson v. Jones,*
    515 U.S. 304 (1995) ................................................................................. 53

*Johnson v. Yellow Freight Sys., Inc.,*
    734 F.2d 1304 (8th Cir. 1984) ................................................................ 69

*K-B Trucking Co. v. Riss Int'l Corp.,*
    763 F.2d 1148 (10th Cir. 1985) ............................................................... 68

*Lewis v. City of Ft. Collins,*
    903 F.2d 752 (10th Cir. 1990) ................................................................. 27

*Malik v. Arapahoe Cnty. Dep't of Soc. Servs.,*
    191 F.3d 1306 (10th Cir. 1999) ............................................................... 64

*Milam v. Pafford EMS,*
    729 F. App'x 632 (10th Cir. 2018) (unpublished) .................................... 52

*Moore v. City of Wynnewood,*
    57 F.3d 924 (10th Cir. 1995) .................................................................... 62

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ........................................................................... 32, 33

*Morris v. City of Colorado Springs,*
    666 F.3d 654 (10th Cir. 2012) ............................................................ 35, 60

*Mullenix v. Luna,*
    577 U.S. 7 (2015) ..................................................................................... 48

*N. Nat. Gas Co. v. Nash Oil & Gas, Inc.,*
    526 F.3d 626 (10th Cir. 2008) ............................................................ 34, 54

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ............................................................................. 45, 50

*O'Neal v. Ferguson Const. Co.,*
    237 F.3d 1248 (10th Cir. 2001)....................................................41

*O'Shea v. Yellow Tech. Servs., Inc.,*
    185 F.3d 1093 (10th Cir. 1999)....................................................46

*Pahls v. Thomas,*
    718 F.3d 1210 (10th Cir. 2013)....................................................52

*Paolitto v. John Brown E. & C., Inc.,*
    151 F.3d 60 (2d Cir. 1998)...........................................................69

*Payan v. United Parcel Serv.,*
    905 F.3d 1162 (10th Cir. 2018)..............................................26, 32

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ....................................................................49

*Piercy v. Maketa,*
    480 F.3d 1192 (10th Cir. 2007)....................................................26

*Porter v. Regents of Univ. of Colorado,*
    No. 22-CV-00335-MDB, 2023 WL 2664207
    (D. Colo. Mar. 28, 2023)..............................................................47

*Quinn v. Young,*
    780 F.3d 998 (10th Cir. 2015)......................................................49

*Beech Aircraft Corp. v. Rainey,*
    488 U.S. 153 (1988) ....................................................................67

*United States v. Rodella,*
    804 F.3d 1317 (10th Cir. 2015)....................................................65

*Saucier v. Katz,*
    533 U.S. 194 (2001) ....................................................................49

*Scott v. Harris,*
    550 U.S. 372 (2007) ....................................................................53

vi

*Sh.A. ex rel. J.A. v. Tucumcari Mun. Sch.,*
321 F.3d 1285 (10th Cir. 2003)...................................................................49

*Simpson v. Univ. of Colorado Boulder,*
500 F.3d 1170 (10th Cir. 2007)..................................................................64

*Smith v. Universal Servs., Inc.,*
454 F.2d 154 (5th Cir. 1972).....................................................................69

*Sprague v. Thorn Americas, Inc.,*
129 F.3d 1355 (10th Cir. 1997)..................................................................44

*Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.,*
569 F.3d 1244 (10th Cir. 2009)..................................................................41

*Starrett v. Wadley,*
876 F.2d 808 (10th Cir. 1989)....................................................................25

*Stepp v. Proctor,*
13 F.3d 407, 1993 WL 498172 (10th Cir. 1993) (unpublished)
...................................................................................................................49

*Stewart v. City of Oklahoma City,*
47 F.4th 1125 (10th Cir. 2022) ..................................................................47

*Surat v. Klamser,*
52 F.4th 1261 (10th Cir. 2022) .............................................................25, 26

*Throupe v. Univ. of Denver,*
988 F.3d 1243 (10th Cir. 2021)........................................................33, 35, 55

*Trujillo v. Univ. of Colorado Health Scis. Ctr.,*
157 F.3d 1211 (10th Cir. 1998)..................................................................40

*Tuffa v. Flight Servs. & Sys., Inc.,*
644 F.App'x 853 (10th Cir. 2016) (unpublished)....................................69

*Vajdl v. Mesabi Acad. of KidsPeace, Inc.,*
484 F.3d 546 (8th Cir. 2007).....................................................................44

*Vasquez v. Davis,*
    882 F.3d 1270 (10th Cir. 2018)...................................................................52

*Vette v. K-9 Unit Deputy Sanders,*
    989 F.3d 1154 (10th Cir. 2021)..................................................................25

*Watson v. Univ. of Utah Med. Ctr.,*
    75 F.3d 569 (10th Cir. 1996).......................................................................49

*White v. Pauly,*
    580 U.S. 73 (2017) .......................................................................................48

*Woodward v. City of Worland,*
    977 F.2d 1392 (10th Cir. 1992)............................................................25, 48

*York v. City of Las Cruces,*
    523 F.3d 1205 (10th Cir. 2008)..................................................................59

*United States v. Young,*
    952 F.2d 1252 (10th Cir. 1991)..................................................................68

## Rules and Statutes

28 U.S.C. § 1331.............................................................................................1

Fed.R.Civ.P. 56...........................................................................................67

Fed. R. Evi. 403 65, 68, 69

Fed. R. Evid. 803(8) ...............................................................................65, 66, 67

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Jurisdiction in the district court was proper pursuant to 28 U.S.C. § 1331. This Court has "limited" appellate jurisdiction over only so much of the district judge's summary judgment decision as addresses "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation and (2) whether that law was clearly established at the time of the alleged violation." *Surat v. Klamser*, 52 F.4th 1261, 1269(10thCir.2022)(quotation omitted). For the reasons set forth below at pp. 53–69, the defendants are incorrect to claim that this court has jurisdiction over any other aspects of the district judge's summary-judgment decision.

**FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW[1]**

I.   Brian Dale Becomes Ms. Ellis's Supervisor, and Curtails her Ascendant Career

Martha Ellis joined the Salt Lake City Fire Department as a firefighter in 1994. Thereafter, she quickly moved up the ranks. In 2004, she was promoted to Fire Captain and served as the Fire Marshal for the Salt Lake City International Airport. In 2009, she was promoted to Battalion Chief and assigned the prestigious posts of City Fire Marshal and Fire Prevention Bureau Division Chief, where she served until 2014. App.V/1375–1382.[2]

As Ellis progressed through the Department, she collected accolades

---

[1]   The defendants attempt to attack the district judge's findings as being "blatantly contradicted by the record." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162(10thCir.2021)(quotation omitted). To illustrate the ample record support that the district judge's findings enjoy, this fact section principally comprises the relevant portions of those findings, with supporting record citations, subheadings of undersigned counsel's choosing, and additional context in the footnotes.

[2]   The electronically filed appendix volumes are cited as App.[Vol. No.]/[page no.]; the conventionally filed audio files in the appendix are cited as App.[vol. no.]/[page no.]([file name], [hour]:[min.]:[sec.]); the defendants' brief is cited as D.Br.[page no.]; entries from the district court's docket are cited as ECF No.[Docket entry no.].

and acclaim. In addition to her associate degree in fire science, she earned a master's degree in national security studies from the Naval Postgraduate School, a fellowship to study at the Harvard Kennedy School's Senior Executives in State and Local Government Program, and a graduate certificate in conflict resolution and mediation from the University of Utah. She was also the most decorated female officer in a fire department sorely lacking women in leadership roles. Ellis received a Golden Spanner Award in 1996, a Chief's Certificate of Merit in 2005, and the Chief's Recognition Medal in 2011. App.V/1375–1382.

In late 2013, Deputy Chief Brian Dale became Ellis's direct supervisor. Dale quickly set up a meeting with Ellis to discuss his expectations for their relationship. At this meeting, Dale allegedly made a "comment about taking [disgruntled employees] outside the office or something along those lines and handing them a tampon." App.II/478. He also referred to a female dispatcher as a "mean ass, crazy police bitch," and a female accountant for the City as a "bitch." T.II/474, 478–480, 494, T.V/175(Ellis_002347, 1:54:10).

Within several weeks of their meeting, Dale began criticizing Ellis's

alleged lack of adherence to the chain-of-command. Specifically, in an email exchange, Dale complained to Ellis that she was bypassing him to discuss issues directly with the Chief of the Department, Kurt Cook. App.III/700–703.[3] At this time, Cook and Ellis were personal friends. App.II/529.

The next day, January 10, 2014, Dale and Ellis met to discuss Ellis's insubordination.[4] Unbeknownst to Dale, Ms. Ellis recorded their conversation, as she often did with other men in the Department. At the meeting, Ellis agreed to include Dale on emails[5] to Chief Cook and the conversation moved on to Ellis's strained relationship with the City's grant

---

[3]    Ms. Ellis started this January 9, 2014 email exchange by writing to Dale about him bypassing the chain of command by going straight to her captains; Dale responded with his accusations of insubordination. App.III/700-703.

[4]    While Dale characterized Ms. Ellis's conduct as insubordinate, a comprehensive decision by the Salt Lake City Civil Service Commission (the "CSC decision") found that Ms. Ellis's subsequent demotion was "not supported by substantial evidence." App.IV/1067.

[5]    On December 18, 2013, Dale had told Ms. Ellis about how Dale had told Chief Cook that Dale should not be copied on political (rather than operational) emails between Ms. Ellis and Chief Cook, App.V/1369 (ELLIS_002347, 1:28:25), which is a distinction that Ms. Ellis acknowledged in a January 9, 2014 email to Dale. App.III/701("Sometimes the distinction between political and operational is where the challenge lies.").

writer.[6] Responding to Ellis's frustration with the grant writer, Dale stated that "Sarah can be a real bitch." Ellis responded, "But you know what? The bitchier the women, the more I actually like 'em. I mean I love Mary Beth. I really like working with her." App.V/1369(ELLIS 002347, 27:20).[7]

Ms. Ellis also testified that during the conversation, Dale made a comment about throwing tampons at employees and that she made it clear to Dale that his comments were offensive and unwanted. App.II/474, 478, 480, 494, 530. Ms. Ellis does not deny that she has used the words "bitch," "bitchy," or "bitchier," but she maintains that she has never used them in a way that was hostile towards women. App.II/479.

On February 6, 2014, Dale issued Ms. Ellis a written warning, allegedly to address Ms. Ellis's flagging performance due to her disregard for the

---

[6]     While Dale characterized Ms. Ellis's relationship with Sarah the city grant writer as "strained," the evidence is that Dale disparaged Sarah by calling her a "real bitch," then Ms. Ellis reversed that disparagement by saying that the purportedly "bitch[y]" qualities that Dale was referring to made Ms. Ellis like Sarah "more." App.V/1369 (ELLIS 002347, 27:20).

[7]     After Ms. Ellis said she liked Mary Beth, Dale offered his opinion of Mary Beth. App.V/1369 (ELLIS 002347, 28:36 (Dale: "Mary Beth is more bitchy than Sarah . . . .").

Department's chain-of-command. App.III/706.[8] While Dale maintained that this warning was not disciplinary, Ellis believed that the warning was "a marker being placed in [her file] in the hopes of keeping [her] from ever getting promoted again." App.II/483. Later that month,[9] Dale met with Ms. Ellis and the Department's HR consultant, Jennifer Sykes, to discuss the warning. During this meeting, Dale complained about Ellis's leadership, her supervision of subordinates, and her communication with individuals both inside and outside of the Department. Dale and Ellis also engaged in the following exchange when Dale attempted to encourage Ms. Ellis to better connect with lower-rank Fire Captains:

> Dale: We talked about relationships. We talked about I want you to get out there in front. Talked about at the grass[root] level, this is what you can do. As a captain, this is what I'm seeing -- boom, boom, boom -- this is how you do it. "God, she can do it. If a girl can do it, I mean --" You know how guys are out there. If we sit up here in the ivory tower and talk above their heads—
>
> Ms. Ellis: [Laughs] Yeah, he just said that. [Laughs]
>
> Dale: I just--I just--You know--I don't want the guys to think that

---

[8]    See supra n. 4 , citing App.IV/1067 (CSC decision found that alleged insubordination and flagging performance were not supported by substantial evidence).

[9]    The meeting also took place on February 6, 2014. App.IV/921.

you're -- that you and I are just miserable day workers. I think there is some value in getting in there with those guys and being able to talk to 'em and understanding what they're going through. That's all.

Ms. Ellis: All right.

T.III.705(ELLIS_002368, 1:11:35).

Ellis wrote and submitted a response to Dale's written warning, as was her right, arguing that the allegations contained in the warning were false. T.III/740–757. She also detailed specific instances in which she was subject to verbal abuse and discrimination by members of the Department.[10] In her deposition, Ms. Ellis testified that she believed the written warning was a result of gender discrimination for the following non-exhaustive reasons:

1. She "did not feel like [she had] had any formal coaching or counseling, nor did [she] feel like any of that was documented. [She] felt like it was a blind side. [She] literally had no idea this was coming."

2. Dale instructed her to issue a written warning to a female employee

---

[10]    Ms. Ellis's seventeen-page single-spaced response comprehensively refutes the claims in the written warning. For example, whereas the written warning criticized Ms. Ellis for her program management skills, Ms. Ellis's response provides detailed descriptions of twelve programs that she had successfully managed through to completion. App.IV/746–749.

regarding e-cigarettes after she had received a verbal warning, which Ellis believed was trivial. Dale did not request that she write up men for similar violations. This led her to believe that the women in the Department "were taking a hit at this point."[11]

3. Dale's comment that "If a girl can do it, I mean--' You know how guys are out there."

4. She had previously been written up for things that "kind of don't make a lot of sense."

5. "[G]uys would keep getting the get-out-of-jail-free cards and, you know, the rules were different for the women."

T.II/483–485. Ellis also believed that the warning was retaliatory because she had previously complained about the sexist behavior of men in the

---

[11]    Whereas Dale had encouraged Ms. Ellis to write up a female subordinate (Kim Matthews) for using an e-cigarette, T.III.705 (ELLIS_002368, 4:03), when a male subordinate (Gene Riddle) was "overtly insubordinate and . . . extremely aggressive toward" Ms. Ellis, Dale encouraged Ms. Ellis to continue coaching and counseling him rather than writing him up. App.III/486–487; see also App.IV/1066 – 1067 (CSC decision finds that Riddle received coaching and counseling without discipline whereas Ms. Ellis received discipline without coaching and counselling).

Department to Melissa Green, the City's EEO manager. Green "had [possibly] said something to these guys about, you know, my initial visit with her." App.II/485. Ms. Ellis thought that "there weren't a lot of [other] explanations for why all of the sudden it really felt like those micro aggressions had now transferred into a full court press." App.II/485.

On September 30, 2014, Chief Cook promoted Robert "Rusty" McMicken to the position of Administrative Assistant Chief. App.I/209, ¶ 69. Ellis had hoped to receive this promotion. Like Ellis, McMicken joined the Department in 1994 as a firefighter. He then served as a Captain before receiving a promotion to Battalion Chief in 2010. McMicken served as Battalion Chief of Logistics from 2012 until he was promoted to Administrative Assistant Chief. Despite McMicken's similar rank to Ellis in 2014, she believed that he was less qualified than she based on her "extraordinary efforts to get additional training," her "much broader understanding of the fire department as a whole," her work at the "national level," and her recently obtained degree in national security studies. App.II/487–488.

Soon after learning that she would not receive the promotion to Assistant Chief, Ellis requested to meet with Chief Cook regarding the decision.[12] Cook invited Dale and Karl Lieb, a Deputy Chief of the Department, to the meeting, explaining to Ellis that he operated "as one" with Dale and Lieb. App.III/767(ELLIS_002353, 14:40).[13] At the meeting, Ms. Ellis stated that she believed that the decision not to promote her had "a bit to do with, um, well -- I think the fact that I'm a woman has something to do with it. I will throw that out there." Cook responded:

> That's really fascinating actually because that's not the case at all. I'll be straight up with you, it's about--it's about team chemistry. And I think what you illustrated by wanting to meet with me individually is representative of some of that. And I think it is a matter of confidence in being able to sit down and [inaudible] issues and have those discussions and work together as a cooperative or collaborative team. And I just haven't felt that.

App.III/767(ELLIS_002353, 19:38). Ellis later testified that Cook also

---

[12]    This meeting took place on September 30, 2014, App.II/767. Given that McMicken's promotion is the subject of the September 30, 2014 meeting, it is clear that the promotion took place before September 30, 2014.

[13]    Before McMicken was promoted, Dale had told Ms. Ellis that Dale and Lieb would be the ones to make the decision on whom to promote to Administrative Assistant Chief. App.II/488–489.

complained to her that, "you come in here, you know, making these allegations that you're not getting promoted because you're a woman . . . That's just bullshit." App.III/767(ELLIS_002353, 32:00); App.II/489.[14]

Additionally, she maintained that when she stated that she had been discriminated against, Cook became "physically agitated and uncomfortable, shifting in his seat." Id. at 89:1-6. Moreover, during the meeting, Lieb explained that Ellis was not promoted, in part, because he believed that she was not "humble enough." App.II/489. In response to this criticism, Ms. Ellis contends that there were "several times in [her] interview when [she] actually own[ed] up to [her] mistakes." App.II/490; App.III/767 (ELLIS_002353, 26:26–26: 50;57:16–1:01:00) (Ms.Ellis acknowledging past mistakes with project execution and communication, and seeking feedback on efforts to "own," address, and improve on those mistakes).

In October 2014, Cook removed Ms. Ellis from her position as Fire

---

[14]    Chief Cook called Ms. Ellis's report of sex discrimination "bullshit" at least three times; he also told her that he was going to "call [her] out," and that "[t]hese guys will stand right behind me." App.III/767 (ELLIS_002353, 32:00).

11

Marshal and appointed her as the new Division Chief of Logistics. While her rank, pay, and benefits did not change, Ellis interpreted her transfer as a demotion because her responsibilities were reduced. According to Ellis, the fire marshal position is . . . often referred to as the alter ego of the fire chief. It's a very revered position, it's a very high profile position"; the new position provided a smaller staff and less influence in the community. App.II/490–491. Cook justified his decision by arguing that Ellis had outgrown her role as Fire Marshal and that this new position would bring her closer to his administration. App.III/767(ELLIS_002353, 33:50).

II.  Ms. Ellis Reports Gender Discrimination and Retaliation, Several Co-Workers Substantiate her Reports, and the Defendants Continue to Discipline her without Cause

On November 24, 2014, Ms. Ellis filed her first EEOC Charge. App.I/85. Ellis's Charge indicated that the Department had discriminated and retaliated against her because of her gender. It alleged that Dale had singled her out for punishment and made several derogatory comments towards her and other women in the Department based on their gender. It also

12

complained that she was unjustly passed over for promotion multiple times and reassigned to a lesser position against her will. App.I/85. On March 16, 2015, Ellis sent a letter to the EEOC updating this Charge. Her amendment focused on the conduct of her new supervisor, Assistant Chief McMicken. Ellis claimed that since the filing of her initial Charge, McMicken had denied her networking opportunities, unjustifiably scrutinized her performance, and made defamatory statements about her work. ECF No. 43-1.

On April 27, 2015, McMicken delivered a pre-determination letter to Ellis. The letter informed her that he was considering disciplinary intervention because she was exhibiting "an apparent lack of engagement with [her] current assignment, a lack of ownership of  [her] job responsibilities, an inability to follow instructions[,] and a lack of respect for [her] chain of command." App.III/773–778. The Department eventually held a hearing on this complaint in June 2015, after which McMicken decided to suspend Ellis for two days. App.III/779–787.[15]

---

[15]    Acting on his own accord, Lieb denied Ms. Ellis's internal appeal of her two-day suspension; Lieb wrote the denial letter himself, and he had not been "forced to sign any[thing] regarding" Ms. Ellis. App.IV/1127–1129.

On April 7, 2015, Cook announced his retirement, effective April 30, 2015. T.II/504. On April 28, 2015, two days before Cook was to step down, Ms. Ellis sent an application for the Fire Chief position to Mayor Ralph Becker. At this point, Mayor Becker had not formally posted a call for applications. In response to her application, the Mayor's Chief of Staff, David Everitt, informed Ellis that Mayor Becker had already selected a new Fire Chief. Upon hearing this news, Ms. Ellis offered to speak with the Mayor about the EEOC Charge pending against the Department's leadership—the very set of individuals who she assumed had been considered for Fire Chief. Everitt declined the invitation, stating that he believed a direct meeting with the Mayor was "not advisable" since Ellis's Charge was also pending against the City. App.III./771–772.

On May 4, 2015, the Mayor announced that Dale was to become the new Fire Chief. App.I/151(¶ 88), 213(¶ 88). His tenure would be a short one because audio of his use of gendered language was leaked to the press. App.IV/1091–1092. Everitt later testified that Ms. Ellis was not a serious contender for the role of Fire Chief because "she had been considered at one

point much earlier in the mayor's tenure and quickly ruled out as a potential candidate at that point." Everitt maintained that Ellis was not competitive because she was "in some cases abrasive and off putting in others." [16] Everitt believed that Ellis "was a nightmare in her role as Fire Marshal" since "she was difficult to work with, . . . at times was not very present or responsive, and just broadly did not seem to have the level of respect and trust that someone in that role should have had for the city." App.III/710–712.

In response to both McMicken's discipline and Dale's promotion, Ms. Ellis again amended her EEOC Charge. In a letter to the EEOC dated May 5, 2015, Ellis alleged that McMicken's unwarranted complaints and controlling behavior had reached the point where they constituted a hostile work environment. She also argued that the reason she had been issued a pre-determination notice in April was to prevent her from being considered for the Fire Chief position that eventually opened that May. App.V/1252–1255.

On May 22, 2015, Ms. Ellis sent the Department's EEO Manager,

---

[16]    Everitt also said that Dale "had his occasional abrasive moments as well. There's no question of that." App.III/711.

15

Green, an e-mail with allegations regarding Cook, Dale, Lieb, McMicken, Human Resources Director Debra Alexander, and Sykes. App.III/818–825. Thereafter, four Department employees submitted evidence supporting Ellis's claim that members of the Department's leadership team, specifically Dale, regularly used sexist language. On August 3, 2015, Captain Steve Hoffman told Green that Dale had said on multiple occasions that "he did not like [Battalion Chief] Ellis," that he "wrote her up" and was "finally going to hold her accountable," and that he "really hate[d] that bitch." App.V/1203–1204. On August 31, 2015, Brittany Blair told Green that she witnessed a meeting with Dale, Lieb, and McMicken where Dale called Ellis "a bitch." App.V/1208.

On October 20, 2015, Sarah Bohe spoke with Green and stated that while Dale was describing projects that he was working on, he had said, "Oh that fucking bitch is making it so hard," referring to Ellis. App.IV/1194. And on November 2, 2015, Crystal VanDongen spoke with Green and alerted her to the fact that she "had been discriminated against based on [her] gender, been subjected to a hostile work environment and been retaliated against

based on [her] affiliation with Battalion Chief Martha Ellis"; VanDongen also explained to Green that she had heard Dale refer to several women as bitches, and stated that McMicken and Lieb had made offensive comments regarding women. App.V/1356–1363.

Green prepared a 24-page report detailing her findings and, on November 18, 2015, determined that the available evidence did not support Ms. Ellis's allegations that she was disciplined, transferred, treated differently, or not promoted based on her gender. App.III/826–853. It also found that the allegations against Dale were insufficiently supported to substantiate a policy violation even though several members of the Department had come forward to complain that Dale had used misogynistic language to refer to Ellis and other women. App.III/826–853.

In January 2016, the Department promoted Clair Baldwin to Assistant Chief of Operations. App.I/ 156(¶ 118), 217(¶ 118). Ms. Ellis had hoped to receive this promotion. App.II/518. Baldwin had joined the Department in 1985, serving in the Operations Division as a firefighter. He was a paramedic, Fire Captain, and Battalion Chief before being promoted to Division Chief

17

of Medical Services, where he served for more than three years until his next promotion to Assistant Chief. App.V/1385–1390.

On March 16, 2016, McMicken issued Ellis a second pre-determination notice informing Ellis that McMicken had again observed a "pattern of performance" that caused him "to question [her] ability to effectively manage and perform [her] job duties." App.III/800–807. By this time, McMicken was certainly aware that Ellis had filed an EEOC complaint against him. App.V/1307. On April 11, 2016, the City held a pre-determination hearing regarding Ellis's job performance, and on May 3, 2016, she was demoted to Captain. App.III/808–817. The Department allowed Ellis to select her next job from two available positions: Apparatus Captain in the Logistics Division, or Station Captain in the Operations Division. Ms. Ellis selected the Operations Captain position because it would allow her to avoid reporting directly to McMicken. App.II/525.

On May 13, 2016, Ms. Ellis requested FMLA leave as a result of her declining mental health. By this point, Ellis was allegedly experiencing severe anxiety due to the hostile work environment that she had faced for

18

the past several years. According to her treatment provider, Gail Szykula, Ellis requested leave because she would likely have difficulty planning, organizing, managing responsibilities, and managing emergency response for twelve weeks. App.II/324–327. The City granted Ellis's first request for FMLA leave through August 26, 2016. After these twelve weeks of leave, Ms. Ellis had exhausted all of the FMLA leave that she was entitled to under the Department's FMLA policy. App.II/452.

While on FMLA leave, Ms. Ellis once more amended her EEOC Charge. In this final letter to the EEOC, dated July 8, 2016, Ellis detailed the ongoing alleged discrimination and retaliation that she was experiencing, naming McMicken, Lieb, and Dale as the primary culprits. App.V/1257–1263. In addition to continuing to attempt to redress her situation through the EEOC process, Ms. Ellis also turned to the Salt Lake City Civil Services Commission for relief. The CSC had the power to determine whether City agencies had violated the City's employment policy. At some point during her leave, Ellis submitted an appeal of her May 2016 demotion to this body. App.I/159(¶ 132), 219(¶ 132); App.IV/1020–1069.

On August 15, 2016, prior to the expiration of her FMLA leave, Ms. Ellis requested a full-time Director's leave of absence from then-Chief Dale. In her request, Ellis indicated that she was hopeful that she could return to the Department "within a few months." Dale granted this request and permitted Ellis to take leave through November 26, 2016. App.II/454–456. But on November 18, 2016, Ellis requested additional leave, this time from the new Chief, Lieb, which Lieb granted through February 28, 2017. App.II/457–458.

III.    Defendant Lieb Denies Ms. Ellis Further Leave, The Department Refuses Ms. Ellis's Request for Accommodations, and Defendant Lieb Terminates Ms. Ellis's Employment

On January 31, 2017, Szykula informed the City that she anticipated Ellis would return to work on March 1, 2017. App.II/459–461. But on February 17, 2017, despite Szykula's initial representations, Ellis requested Director's leave for a third time. App.II/464–465. Specifically, she asked for leave until her CSC appeal was resolved because she was still "suffering from mental health disorders that ha[d] an adverse impact on [her] psychological wellbeing and cognitive capabilities that [we]re exacerbated

with stress." App.III/601–606. Lieb denied Ellis additional leave and ordered that she return to return to work on March 1, 2017. App.II/464–465. At this point, Ms. Ellis felt as though she was "being forced back to work" even though she was not entirely ready. App.III/601–606.

From February 17, 2017 until March 8, 2017, Szykula, Ms. Ellis, and the Department communicated regarding reasonable accommodations. App.II/590–593, 598–600; App.III/607–638. In response to the additional information provided by Syzkula, on March 9, 2017, Green, who handled ADA accommodations for the Department, informed Ellis that the Department now believed that there were no reasonable accommodations that would allow her to return to work as a Station Captain in Operations because her limitations were too severe to serve in this position. She instead offered to help move Ms. Ellis out of the Department to another position in City government. App.III/639–643. On March 13, 2017, Ellis responded by insisting that she be allowed to work in the Department. She stated that while she was still struggling with her mental health, her condition was merely "episodic" and she wanted to get back to work. App.II/594–597.

On March 14, 2017, Green again explained that the Department would not offer Ellis any accommodations because Ellis had severe work limitations that would continue indefinitely. App.III/644–649. Ellis replied and attempted to explain that her work limitations were temporary and that she hoped to increase her responsibility only two weeks after beginning her new assignment. Green responded the next day by reiterating that she would not allow Ms. Ellis to return to the Department. App.III/651–652.

On March 16, 2017, Ellis made a last-ditch effort to argue for accommodations, explaining that, at maximum, she would need four to six weeks to return to work in a full capacity. App.III/670–672. Then, on March 17, 2017, Green sent Ellis a letter summarizing their discussion and affirming that the Department could not offer her any accommodations. App.III/673–677. Soon thereafter, Chief Lieb informed Ellis that he was terminating her due to her "unavailability to return to work at this time." App.III/678–679.

While Ellis was on leave and her negotiations over accommodations with the Department were ongoing, her CSC appeal moved forward. In early February 2017, the CSC held a two-day hearing to determine the outcome of

the appeal. App.IV/1020–1069. Ellis, McMicken, and representatives of the SLCFD were all present and represented by legal counsel. Each side called witnesses to offer testimony on direct and cross-examination. On May 18, 2017, the three member CSC met and unanimously voted to overturn and reverse Ellis's demotion. The CSC ultimately found that:

1. "McMicken was looking for reasons to discipline Ellis." App.IV/1044.

2. "[A]llegations of Ellis' lack of performance are not supported by substantial evidence." App.IV/1046.

3. The reasons for Ellis's demotion were "trivial in nature." App.IV/1046.

4. The "allegations appear to the Commission to be an attempt to manufacture misconduct and allege failure of performance to justify the disciplinary action, when there were no performance issues." App.IV/1059.

Although the CSC overturned Ms. Ellis's demotion, the Department never restored or reinstated her, since by this time her employment had been terminated. App.I/167(¶¶ 177, 178). Ellis was only paid the salary that she lost due to her demotion—$7,166.74. App.VI/1527.

## SUMMARY OF THE ARGUMENT

The district judge's findings show that the defendants engaged in disparate treatment based on Ms. Ellis's gender, pp. 25–32, and that they created a hostile work environment based on Ms. Ellis's gender. Pp. 32–48.

Ms. Ellis's equal-protection right to be free from gender discrimination under color of state law was clearly established when the defendants violated that right. 48–53.

The defendants exceed this court's jurisdiction by claiming that the record blatantly contradicts the district judge's findings because those findings are well supported by the record. Pp. 53 –61.

The defendants appellate Title VII and *Monell* claims do not rise to the level of appellate argument, pp. 61–62; they are not inextricably intertwined with the qualified immunity claims; and they fail on their merits. pp. 62–63.

The defendants' waived evidentiary claims exceed the jurisdiction of this court, pp. 64–65; and they fail on their merits because the CSC decision as a public record whose probative value was not substantially outweighed by a risk of unfair prejudice. Pp. 65–69.

## ARGUMENT

I.   The District Court Properly Denied Qualified Immunity to the

Individual Defendants

"Under the collateral order doctrine" this court may review

"interlocutory appeals from the denial of qualified immunity to a public

official to the extent it involves abstract issues of law." *Surat v. Klamser*, 52

F.4th 1261, 1269(10thCir.2022)(quotation omitted). "Abstract issues of law

are limited to (1) whether the facts that the district court ruled a reasonable

jury could find would suffice to show a legal violation and (2) whether that

law was clearly established at the time of the alleged violation." *Id*. "[I]f a

district court concludes a reasonable jury could find certain specified facts in

favor of the plaintiff, [this court] must usually take them as true. . . ." *Vette v.*

*K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162(10thCir.2021).

The legal right here at issue is Ms. Ellis's Equal-Protection right to be

free from "sexual harassment under color of state law." *Woodward v. City of*

*Worland*, 977 F.2d 1392, 1397–1399(10thCir.1992), citing *Starrett v. Wadley*, 876

F.2d 808(10thCir.1989). The district judge held that the factual findings

showed that the defendants committed disparate-treatment sex discrimination, App.VI/1562–1575, citing *Piercy v. Maketa*, 480 F.3d 1192, 1203(10thCir.2007), and hostile-work-environment sex discrimination. App.VI/1575–1580, citing *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1171(10thCir.2018). In conducting its *de novo*, review of those "purely legal issues," *Surat*, 52 F.4th at 1269, this court should reject the defendants' arguments.

     a.  The Facts Found by the District Judge Show that Each Defendant Violated Ms. Ellis's Rights

          i.  The District Judge's Findings Show that the Defendants Committed Disparate-Impact Sex Discrimination

To succeed with her disparate-impact claim, Ms. Ellis had to present evidence from which a reasonable judge could find that the defendants had treated her less favorably than non-members of her protected class with respect to adverse employment actions in connection with positions for which she was qualified, *Maketa*, 480 F.3d at 1203, and that the defendants' "stated reasons" for those adverse employment actions were "pretextual."

26

*Barrett v. Salt Lake Cty.*, 754 F.3d 864, 867(10thCir.2014). The district judge decided that Ms. Ellis had satisfied these requirements with respect to three adverse employment actions:  The defendants' failure to promote her to Assistant Chief in September 2014; the defendants' failure to promote her to Operations Assistant Chief in January 2016; and the defendants' demotion of her in May 2016. The defendants fail in their attempts to attack these decisions by the district judge.

The defendants argue that, to overcome their qualified-immunity defenses, Ms. Ellis had to prove that each defendant harbored a subjective "intent to discriminate based upon" her gender. D.Br.38, quoting *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213(10thCir.2022) and *Lewis v. City of Ft. Collins*, 903 F.2d 752, 755 n.1(10thCir.1990). That is incorrect. *Ford* does not speak to qualified immunity at all; it deals with municipal liability under Title VII. And *Lewis* refers to the now defunct notion that a defendant's subjective intent has something to do with their entitlement to qualified immunity. Compare *Lewis*, 903 F.2d at 755("Absent a discriminatory motive or intent, defendants' challenged conduct would not violate clearly

established law."), with *Crawford-El v. Britton*, 523 U.S. 574, 575(1998)(holding that even if evidence concerning the defendant's "subjective intent . . . may be an essential component of the plaintiff's affirmative case," it is nonetheless "irrelevant to the qualified immunity defense"). These cases are unhelpful to the defendants.[17]

To advance their intent argument, the defendants incorrectly claim that the district judge "did not find any conduct that established [McMicken] exhibited a gender animus" and that the district court had "[s]et[] aside the issue of whether McMicken exhibited signs of animus." D.Br.39. The passage from which the defendants quote describes McMicken's demotion of Ms. Ellis, its having been sanctioned by Dale, and Dale's discriminatory conduct and statements establishing the necessary causal link. App.VI/1569. Rather

---

[17]    Even if subjective intent were an issue, this court would "not have jurisdiction to review the district court's conclusion that a reasonable jury could find that" the defendants possessed the requisite intent. *Hubbard v. Nestor*, 830 F. App'x 574, 580 (10thCir.2020)("[P]retrial questions about the existence or nonexistence of intent are particularly inappropriate for interlocutory appeal . . . .")(quotation omitted).

28

than exculpating him, this passage implicates McMicken as the willing implementor of Dale's discriminatory decision to demote Ms. Ellis.

The defendants also attempt to mount four attacks on the district judge's finding that Ms. Ellis had "present[ed] evidence tending to show that Defendants' proffered reasons for taking adverse employment actions against her [were] pretextual." App.VI/1575, D.Br.39–44. But the district judge had an ample basis on which to rest findings that the defendants' proffered reasons were pretextual, so their argument to the contrary fails.

The defendants first complain that the district judge addressed pretext in the context of all of the defendants' adverse employment actions. But this complaint fails for lack of legal and factual support. Legally, there is no support in the case law for the notion that a district judge lacks discretion to address the specifics of several adverse employment actions one after another, App.VI/,1562–1572, and then address the issue of pretext subsequently. App.VI/1572–1575. And the district judge carefully distinguished between the adverse employment actions as to which Ms. Ellis had satisfied her disparate-treatment burden, and those as to which she had

29

not. The summary judgement decision describes the details of each adverse employment action, reviews the defendants' proffered reasons, and spells out why the district judge did or did not determine that Ms. Ellis had met her burden. App.VI/1561 n. 13, 1562–1575. Ultimately, the district judge found that Ms. Ellis had "not established a prima facie case on all her claims, [but] she ha[d] provided sufficient evidence to advance several retaliation and discrimination claims." App.VI/1572. The defendants' attack fails.

The defendants' next two attacks address the district judge's pretext findings as they pertain to the defendants' decision to promote someone other than Ms. Ellis to Administrative Assistance Chief and Operations Assistant Chief. But the cases on which the defendants rely are distinguishable. And their review of the record overlooks key facts. Consequently, these attacks fail too.

*Jaramillo v. Colorado Jud. Dep't*, 427 F.3d 1303(10thCir.2005) and *Ford*, 45 F.4th at 1213 are distinguishable. In *Jaramillo*, the plaintiff's only evidence of pretext was that she had "scored a fraction of a point higher than" than the other candidate on an objective test, and that her supervisor had initially told

her that the other candidate had scored higher. 427 F.3d at 1308. In *Ford*, the

plaintiff's only evidence of pretext was amorphous statistical data, critiques

about subjective promotion criteria, and minor differences in qualifications.

Both of those cases involve this court affirming district judges' summary

judgment decisions, and neither case involves the multiple adverse

employment actions, history of discriminatory behavior, and administrative

finding of pretext that are involved here.

And *Jaramillo* explicitly notes that, in determining whether the

defendants' proffered reasons are pretextual, courts should consider the

defendants' "prior treatment of plaintiff." 427 F.3d at 1308(quotation

omitted). Yet the defendants ignore the CSC decision, and ignore the

evidence of their prior discriminatory treatment against Ms. Ellis, instead

focusing solely on the evidence of differential qualifications. Whether or not

the evidence of differential qualifications would itself suffice to show

pretext, when coupled with the other discrimination evidence, and the CSC

decision, the evidence in this case suffices to show pretext.

ii. The District Judge's Findings Show that the Defendants Created a Hostile Working Environment

Each of the defendants argues that the conduct in which they participated was not "sufficiently severe or pervasive to alter the conditions of [Ms. Ellis's] employment and create an abusive working environment," which is an essential element to a hostile work environment claim. *Payan*, 905 F.3d at 1171. But the district judge's findings show how each defendant inculpated himself by helping to create the hostile work environment that Ms. Ellis experienced. Consequently, each of the defendants' attacks fails.

The defendants argue that "it was legal error for the district court to analyze findings that Plaintiff was reassigned, not promoted, and demoted as part of a sexual harassment claim" that was based on a "[h]ostile work environment." D.Br.23. To support this argument, the defendants rely on *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1185(10thCir.2003)(quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115(2002)). Neither of these cases offers any such support, so the defendants' argument fails.

*Davidson* and *Morgan* address statute-of-limitations issues, not the relevancy of discrete discriminatory acts to a hostile-work-environment claim. In *Davidson*, this court implemented the Supreme Court's holding from *Morgan* that there was no "continuing violation doctrine" that would allow for the consideration of otherwise time-barred conduct in relation to claims based on "discrete acts" of discrimination, but that conduct preceding the statutory limitations period could be considered for purposes of claims based on a "hostile work environment." *Davidson*, 337 F.3d at 1185, quoting *Morgan*, 536 U.S. at 115. Neither case speaks to whether failure to promote, demotion, or termination are relevant to a hostile-work-environment claim.

The defendants' next argument is an attempt to circumvent the summary-judgment standard. D.Br.23–24. Citing *Chavez v. New Mexico*, 397 F.3d 826, 833(10thCir.2005) and *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251(10thCir.2021), the defendants argue that "Lieb expected humility of both male and female candidates," so Ms. Ellis has failed to prove that he harassed her "based on gender." This argument fails on the law and the facts.

33

Starting with the facts, the defendants' argument ignores them. Even putting aside Lieb's humility comment, there is ample evidence from which a jury could reasonably infer that Lieb participated in creating the hostile-work-environment to which Ms. Ellis was subjected on the basis of her gender. VanDongen explained to Green that she had heard Lieb make offensive comments regarding women. App.V/1356–1363. Lieb denied Ellis's two-day suspension appeal, App.IV/1127–1129, denied her additional leave and ordered her to return to work on March 1, 2017. App.II/464–465. As Chief, Lieb signed Ellis's termination letter. App.III/678–679. The defendants' argument ignores this and other evidence inculpating Lieb.

Regarding the law, the district judge was required to view the evidence in the light most favorable to Ms. Ellis. *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629(10thCir.2008). Given the contextual evidence of a gender-based hostile environment, App.IV/1194, App.V/1203–1204, 1208, 1356–1363, the district judge did not have discretion to draw the defendants' favored inference that Lieb would have complained about an alleged lack of humility irrespective of Ms. Ellis's gender.

Nor do the other cases the defendants cite support their argument. In *Throupe*, the only conduct that "appear[ed] to be facially sex-based" was the employer's comment that she had made a Title IX report because there was a relationship between "a male faculty [and a] female student." 988 F.3d at 1253. Conversely, there is ample evidence of additional sex-based conduct in this record, App.IV/1194, App.V/1203–1204, 1208, 1356–1363, so the context not only supports but requires the inference that Lieb's humility comments were sex-based. And in *Chavez*, this court held that evidence of facially sex-based harassment may allow a jury to "infer that the arguably gender-neutral harassment . . . was in fact based on gender." *Chavez*, 397 F.3d at 837. Lacking a legal leg to stand on, the defendants' argument falls short.

The defendants also assert that the district judge's findings constitute "'offhand comments'" and "'isolated incidents'" rather than the "'steady barrage of opprobrious . . . comments'" that exemplify a hostile work environment. D.Br.24. But the case on which the defendants rely is distinguishable. In *Morris v. City of Colorado Springs*, 666 F.3d 654(10thCir.2012), a doctor had flicked a nurse twice in the head, and threw

a small piece of tissue in her direction while she was behind him, hitting her in the leg. *Id.* at 666. *Morris* was based solely on a doctor committing three instances of harassing conduct, and making "demean[ing]" comments to a nurse such as "'get your ass in gear' or 'get someone in here who knows what they are doing.'" *Morris*, 666 F.3d at 666. Whereas *Morris* lacked evidence of the defendant using formal discipline to create a hostile environment, the record in this case contains just such evidence.

As to McMicken, the defendants claim the only findings that the district judge made showing "gender-based harassment" were that he "constantly harangued Ellis in ways motivated by gender-based animus[, he] attempted to control essential parts of her job, tracked her goings in and out of the office, and compared her to a secretary," which made it reasonable for Ms. Ellis to argue "that he never would have treated a man in such a way." D.Br.24, quoting App.VI/1580 n.25. These findings strongly implicate McMicken in the hostile work environment Ms. Ellis endured. But the district judge made other findings implicating McMicken as well, including the following:

- McMicken delivered a pre-determination letter to Ms. Ellis and suspended her for two days, App.VI/1535–1536;

- Knowing about an EEOC complaint regarding gender discrimination, "McMicken issued Ellis a second pre-determination notice" again alleging "a pattern of performance" that caused him "to question [her] ability to effectively manage and perform [her] job duties," App.VI/1538;

- The CSC found that "McMicken was looking for reasons to discipline Ellis," App.VI/1543;

- "McMicken had denied [Ms. Ellis] professional growth and networking opportunities, unjustifiably scrutinized her work, and made defamatory statements regarding her work," App.VI/1568;

- McMicken was among "the three individuals responsible for the decision" not to promote Ellis to Operations Assistant Chief, App.VI/1568–1569;

- The CSC decision stated that "allegations of Ellis' lack of performance are not supported by substantial evidence," that McMicken was "attempting to build a case to discipline Ellis, instead of trying to coach and counsel a dedicated employee on how she can improve her performance," and that "the reasons cited by the City for demoting the Plaintiff were 'trivial in nature,'" App.VI/1573;

- "The CSC Decision found that Ellis was singled out for punishment by McMicken on a regular basis. '[A]lmost from the outset of the time that Ellis became a Division Chief, [McMicken] was monitoring her in a way that singled her out and indicated he was looking for reasons to discipline her.' McMicken also demoted Ellis using contrived violations of the City's employment code and hoisted unrealistic expectations on her shoulders in an attempt to hound her out of a job. This evidence is supportive of Ellis's claim that she was forced to accept a

position in Operations that she did not want to take because she

could not continue working for McMicken," App.VI/1580;

- "Ellis's March 16, 2015 letter amending her initial Charge . . .

    pointed out specific ways in which McMicken had fostered

    hostility in the office," App.VI/1585 - 1586.

And the CSC decision also found that after he have given Ms. Ellis "up to

three months to accomplish one part of" a project, he criticized her only one

"month later" for "not talking personally to the Battalion Chiefs, despite the

fact that he had expressly to her that she could either meet with or email"

them (which she had done). App.IV/1043. It smacks of pretext for the

defendants to use conduct they had previously directed or approved of as a

basis for subsequent discipline.

*Bolden v. PRC Inc.*, 43 F.3d 545(10thCir.1994) does not support the

defendants' argument that McMicken is insufficiently inculpated. D.Br.25.

There, the plaintiff had been the subject of "only two overtly racial remarks

. . . and one arguably racial comment" over the course of eight years of

employment. *Id*. at 551. Two years after these remarks, the employer began

39

using workshops that involved the "general ridicule" of employees irrespective of race. *Id*. Consequently, the plaintiff was subjected to "general torment and taunting [that were] not racially discriminatory [and were] not actionable." *Id.* Here, there is evidence that Ms. Ellis was singled out for discriminatory treatment because of her gender, and that males were not subjected to such treatment. App.IV/1061(Ms. Ellis singled out for closer scrutiny than a similarly situated male Battalion Chief).

Nor does *Trujillo v. Univ. of Colorado Health Scis. Ctr.*, 157 F.3d 1211, 1214(10thCir.1998) support the defendants' argument about McMicken. There, the plaintiff presented no evidence that anyone ever said anything suggesting that the treatment he was being subjected to had anything to do with his race, or that it lacked a legitimate employment purpose. *Id*. at 1214. Here, such evidence abounds. McMicken's role in creating the hostile working environment is clear.

Regarding Dale, the defendants incorrectly claim that the district judge "conflate[d] all of [Ms. Ellis's] claims to bolster a sexual harassment claim [for a hostile work environment] that could not stand on its own." D.Br.29–

40

30. But this court has recognized that a plaintiff may rely on "the same evidence for both [her] hostile work environment and retaliation claims," and that, even if a jury ultimately rejects "the hostile work environment claim," the jury is still "free to rely upon overlapping evidence of racial animus in finding retaliation." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1258(10thCir.2001). Thus, rather than wrongly conflating the claims and evidence, the district judge properly weighed the potential of the evidence to support both a hostile-work-environment claim and a retaliation claim.

Next, defendants claim that the district judge found that "individuals heard Dale refer to Plaintiff as a 'bitch' on four occasions." In fact, the district judge found that "over the course of several years, many individuals heard Dale call Ellis a 'bitch,'" including Chief of Staff, David "Everitt[18] . . . Captain Steve Hoffman . . . Brittany Blair . . . Sarah Bohe [and] Crystal VanDongen."

---

[18]     Without citation to the record, the defendants claim that Ms. Ellis only learned of Everitt hearing Dale refer to Ms. Ellis as a bitch "during discovery." D.Br.30, n. 83. Given that it is unaccompanied by any record citation, this court should reject that claim. *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1259 (10thCir.2009)(court should reject party's claim when party "cites no evidence in the record" to support that claim).

App.VI/1578. And rather than representing only "four occasions," Captain Hoffman heard Dale disparage Ms. Ellis "on multiple occasions," and VanDongen's report about Dale and Lieb disparaging Ms. Ellis was similarly not limited to a single instance. App.VI/1578. Thus, the defendants' claims are not supported by the record.

*Ford v. West*, 222 F.3d 767, 777(10thCir.2000) does not support the defendants' arguments. There, to establish that his employer knew or should have known that he was being racially harassed, the plaintiff presented allegations about prior EEOC complaints without any evidence regarding the content of those complaints; claims about his own deposition testimony without any citations to that testimony; and unspecific testimony from a co-worker that he had heard other co-workers use racial slurs "several times." *Id.* at 776–778. Here, the CSC decision on which Ms. Ellis relies is in the record, App.IV/1020–1069, she made specific reference to additional statements from several individuals regarding gender-based disparagement they had witnessed on specific dates and time, App.IV/1194, App.V/1203–

1204, 1208, 1356–1363, and Ms. Ellis's own testimony presents specific instances of gender-based harassment and retaliation as well.

None of the other cases the defendants cite support their arguments. In *Durand v. Shull*, No. 21-1180, 2022 WL 1184041(10thCir.Apr. 21, 2022)(unpublished), the plaintiff worked in a position that "was similar to a guard at a correction center for youths," and she claimed that her supervisor had created a racially hostile work environment by "refus[ing] to act to protect her from exposure to" a juvenile offender who had assaulted and injured her. *Id.* at *3. In that quasi-correctional context, the district judge held that the juvenile offenders' few racially-offensive comments to the plaintiff were not motivated by racial animus, but were instead designed to discourage her from pressing charges for the prior assault (rather than racial animus),  so the comments were not pervasive or severe enough to create a hostile work environment.  *Id.* at *3–*4.

For several reasons, *Durand* is distinguishable. Whereas cases indicate that "'[b]y choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate

43

and socially deviant behavior,'" *id.*, quoting *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550(8thCir.2007), there is no support in the case law for the notion that female firefighters have accepted a probability that they will be disparaged and denied advancement on the basis of their gender. And whereas the disparagement in *Durand* was committed by "a nonemployee third party," *Durand*, 2022 WL 1184041 at *5, the disparagement and denial of advancement in this case were committed by Ms. Ellis's superiors. Thus, *Durand* is unhelpful to the defendants.

In *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366(10thCir.1997), Ed Kowalski became the plaintiff's supervisor in the middle of a sixteen month stretch during which Kowalski had committed "five instances" of "unpleasant and boorish conduct" toward the plaintiff, "the most serious [of which had] occurred at a private club, not in the workplace." *Id.* at 1366. *Sprague* is distinguishable because it involves a claim premised on one (rather than several) individuals' conduct, and that individual was not the plaintiff's supervisor for most of the conduct at issue. Plus, rather than being demoted and then terminated during the relevant period, the plaintiff in

*Sprague* had been promoted and had "stated in writing that she believed Kowalski helped her in her work and that she was 'happy' to work with him" before she quit. *Id.* at 1365–1366. Owing to these distinctions, *Sprague* does not support the defendants' arguments.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75(1998) offers more support to Ms. Ellis's arguments than it does to the defendants. Mr. Oncale claimed that, while working on an "oil platform in the Gulf of Mexico," he had been subjected to a sexually hostile working environment by three of his coworkers. *Id.* at 81. The question was whether same-sex harassment could be considered "discrimination on the basis of sex" under Title VII. *Id.* Considering the "constellation of surrounding circumstances, expectations, and relationships" involved in the rough and tumble context of an offshore oil platform, where inactionable "teasing or roughhousing among members of the same sex" was to be expected, the Court nonetheless held that there had been actionable harassment. A paramilitary emergency services department produces more professional environmental expectations than an

45

offshore oil rig, so *Oncale* tends to support the district judge's denial of summary judgment.

And *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518(10thCir.2017)(unpublished) is distinguishable on the facts and the law. *Brown* is a Rule 12 case that speaks to the allegations necessary to make out a hostile work environment, not the quantum of evidence needed to overcome a qualified immunity defense. *Id.* at 519. Mr. Brown alleged three racial comments by his boss, followed by co-workers' cessation of socialization once he asked his boss to stop, and Mr. Brown's resignation "two or three weeks" later. *Id.* at 519–520. Thus, *Brown* is incomparable to the three years of discriminatory comments, failures to advance, outright demotion, and eventual termination that Ms. Ellis endured.

Ultimately, the defendants' arguments fail in accordance with the precept that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098(10thCir.1999)(quotation marks omitted). To the extent that some of the

46

defendants' hostile conduct toward Ms. Ellis was motivated, not just by gender bias, but also by retaliatory animus, the district judge was free to "aggregate evidence of [one type of] hostility with evidence of [another type of] hostility" to find that there is a genuine dispute of material fact regarding the existence of an actionable hostile work environment. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416(10thCir.1987); cf. *Porter v. Regents of Univ. of Colorado*, No. 22-CV-00335-MDB, 2023 WL 2664207, at *10–11(D. Colo. Mar. 28, 2023)(district judge aggregates "allegations predicated on gender-based hostility and allegations predicated on retaliation for protected activity" to find that plaintiff alleged an actionable hostile work environment).

And whether or not the district court used such aggregation, this court "can affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1132(10thCir.2022)(quotation omitted). Given that the parties fully briefed the ADA and Title VII retaliation claims below, it is fair for this court to consider the ample evidence of the defendants' retaliatory behavior in addition to their gender-based behavior, and to

47

conclude that the district judge's findings show that each defendant helped to create a hostile work environment in violation of Ms. Ellis's Equal Protection rights.

### b. The Rights the Individual Defendants Violated were Clearly Established when those Violations took Place

The defendants claim that the rights for whose violation Ms. Ellis seeks redress were not clearly established when the defendants violated them. D.Br.33–37. This argument imposes a more granular standard of analysis than Supreme Court precedent allows for. Rather than "requir[ing] a case directly on point," the Court has only requires that "existing precedent [] have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 580 U.S. 73, 79(2017), quoting *Mullenix v. Luna*, 577 U.S. 7, 9, n. 136(2015). The relevant constitutional and statutory question in this appeal is whether "sexual harassment under color of state law violates the Equal Protection Clause"; it does. *Woodward*, 977 F.2d at 1397–1399, citing *Starrett*, 876 F.2d at 815 (holding that "discriminat[ing] against [an employee]

because of her sex [] thereby deprive[s] her of the right to equal protection of the laws.").[19]

The defendants cite no cases where courts' clearly-established analyses have employed anything near the level of granularity that the defendants here advance. Instead, they cite to a series of cases involving factual scenarios and constitutional questions that bear no meaningful resemblance to those presented by this record.[20] In discussing the relevant inquiry, the

---

[19]    Decisions in this circuit have uniformly eschewed the defendants' desired level of granularity. See, e.g. *Sh.A. ex rel. J.A. v. Tucumcari Mun. Sch.*, 321 F.3d 1285, 1288 (10thCir.2003)("[T]he law holding that sexual harassment is actionable as an equal protection violation has long been clearly established.") *Stepp v. Proctor*, 13 F.3d 407, 1993 WL 498172, at *1(10thCir.1993)(unpublished)("The law has been clearly established in this circuit since May of 1989 that sexual harassment under color of state law violates the Equal Protection clause."); *Hindman v. Thompson*, 557 F. Supp. 2d 1293, 1307 (N.D. Okla. 2008)("An allegation of sexual harassment is actionable under section 1983 as a violation of the Equal Protection Clause of the Fourteenth Amendment.").

[20]    D.Br.33–37, quoting and citing *Quinn v. Young*, 780 F.3d 998, 1008 (10thCir.2015)(whether Fourth-Amendment probable cause for a larceny arrest arises from "officers[' knowledge] at the inception of [a] sting that [person who takes the bait knows] that he is not the property's true owner"); *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10thCir.2014)(whether a state's failure to protect a child from familial abuse fell within the "special-relationship" or "danger-creation . . . exceptions to the general rule that the

Supreme Court clearly established that when "[c]ommon sense, and an appropriate sensitivity to social context" show that the gender-based conduct fell on the latter side of the distinction "between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive," that conduct violates the plaintiff's constitutional right to equal protection of the law. *Oncale*, 523 U.S. at 82. The defendants are wrong to urge a more granular analysis than controlling cases permit.

---

Due Process Clause imposes no duty to protect against private violence"); *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 578 (10thCir.1996)(whether a "public employer tak[ing] action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities" violates the employee's due-process rights); *Est. of Booker v. Gomez*, 745 F.3d 405, 428–429 (10thCir.2014)(whether "the 'legal norms' underlying the three-factor due process analysis— proportionality, injury, and motive—were clearly established at the time" when an officer exhibited a "disproportionate use of force" against the plaintiff); *Saucier v. Katz*, 533 U.S. 194, 208–209 (2001)(assuming that speed and force with which protester was removed from event with vice president and placed into military police van were excessive under Fourth Amendment, but holding that assumed bounds of Fourth-Amendment right to be free from excessive force were not clearly established), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

*Fye v. Oklahoma Corp. Comm'n*, 175 F. App'x 207, 211(10thCir.2006)(unpublished) illustrates the folly in the defendants' argument. The defendants in *Fye* argued that the plaintiff's rights were not clearly established because no case had declared it unconstitutional for a supervisor to repeatedly ask an employee to recount the details of the employee's sexual harassment complaint under circumstances suggestive of the supervisor's lascivious intent. *Id.* at 211. Rejecting that argument, a panel of this court held that "the general statement in *Woodward* [was] sufficient under the facts of [that] case." *Id. Woodward*'s declaration that "sexual harassment under color of state law violates the Equal Protection Clause" would have put objectively reasonable people in the defendants' positions on notice that it was unconstitutional for them to use their supervisory authority to injure and eventually end Ms. Ellis's career under circumstances where their own statements suggest a discriminatory basis.

The defendants also conflate the legal inquiry of whether a right is clearly established with the factual inquiry of whether a given defendant "'personally participated in the alleged constitutional violation.'"

51

Gov.Br.34–35, quoting *Vasquez v. Davis*, 882 F.3d 1270, 1275(10thCir.2018). The defendants quote passages from cases evaluating whether a plaintiff has shown that an individual defendant violated his rights, not passages addressing whether that right was clearly established. D.Br.34–35, quoting *Vasquez*, 882 F.3d at 1275 and *Pahls v. Thomas*, 718 F.3d 1210, 1233(10thCir.2013). For the reasons set forth above, each of the individual defendants' conduct was sufficient to show their participation in the hostile work environment Ms. Ellis endured.

The defendants go on to cite more cases that do not include a clearly-established analysis. D.Br.36, citing *Brown*, 708 F. App'x at 521; *Milam v. Pafford EMS*, 729 F. App'x 632, 637(10thCir.2018)(unpublished); *Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x 507, 508(10thCir.2017)(unpublished). Aside from the fact that they do not include any clearly-established analysis, these cases are also unhelpful to the defendants because they are factually distinguishable. None of them involve the use of supervisory authority to stop the advancement of, demote, and eventually terminate an employee under circumstances where those explicit changes in job conditions could

reasonably be found to have been discrimination based on employee's gender. Consequently, the defendants fail with their argument that the rights here at issue are not clearly established.

II. This Court Lacks Jurisdiction Over Most of the Defendants' Claims, which also Fail on the Merits

A "defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–320(1995). With perfunctory nods to narrow exceptions to this rule, the defendants focus most of their brief on issues that exceed this court's jurisdiction. These defendants' extra-jurisdictional arguments also fail on the merits. The court should reject them.

a. Nothing in the Record Blatantly Contradicts the District Court's Findings, which are Well Supported

One way in which the defendants attempt to expand this court's jurisdiction is by trying to use the "blatantly contradicted" exception established by the Supreme Court in *Scott v. Harris*, 550 U.S. 372, 380(2007).

The paradigmatic example of that evidence that may blatantly contradict a district judge's findings is "existence in the record of a videotape capturing the events in question." *Id.* at 378. Here, the recordings are perfectly consistent with the district judge's findings, and the judge's findings are well supported in the record, so the defendants' arguments fail.

The defendants attack the district judge's finding that Lieb demeaned Ms. Ellis with a "sexist trope" by citing lack of humility as a reason for not promoting her. D.Br.14–15. But rather than pointing to blatantly contradictive evidence, the defendants point to a recording during which Lieb does cite a lack of humility as a reason for not promoting Ms. Ellis. The evidence must be viewed "in the light most favorable to the nonmoving party," *Nash Oil & Gas, Inc.*, 526 F.3d at 629, so the defendants are wrong to try to replace the district judge's interpretation of Lieb's "humility" comment with their own interpretation.[21]

---

[21]    The fact that the district court's finding was based on documentary evidence does nothing to lower the shield of clear-error review to which that finding is entitled. See *Dalzell v. RP Steamboat Springs, LLC*, 781 F.3d 1201, 1215 n. 10 (10thCir.2015)(noting that "even when the district court's factual

54

*Throupe* is unhelpful to the defendants. There, a non-party employee of the defendant had testified that she had reported the plaintiff's "behavior to the Title IX office . . . because 'it's a male faculty member. It's a female student. . . .'" 988 F.3d 1243 at 1253. To support his allegation of sex discrimination, the plaintiff in *Throupe* relied on the employee's mention of "a male faculty member" during her description of why she had reported him, while omitting the employee's adjacent mention of "a female student" in that same report. In so doing, the plaintiff "cherry-picke[d]" the employee's statement. *Id.*

Here, the district judge thoroughly evaluated the import a jury could reasonably ascribe to Lieb's comments during the meeting with Ms. Ellis. Lieb had criticized Ms. Ellis for a lack of humility and a failure to acknowledge her weakness in the context of a promotion-oriented meeting in "a paramilitary emergency services department [wherein] it is often

---

findings are based on documentary evidence instead of live witness testimony, '[the appellate court is] loath to overturn the findings of a trial court unless they are clearly erroneous'"), quoting *Aetna Cas. & Sur. Co. v. Hunt*, 486 F.2d 81, 84 (10thCir.1973).

expected that men will be assertive and aggressive." App.VI/1564–1565. Consequently, a jury might reasonably conclude that Lieb criticized Ms. Ellis "because she did not meet the Department's contrary expectations for women." App.VI/1565. Nothing in the record contradicts those findings.

Contrary to the defendants' argument, D.Br.15, evidence in the record supports the finding that McMicken, Lieb, and Dale comprised a triumvirate that coordinated a campaign of discriminatory conduct toward Ms. Ellis. For example, in his CSC testimony McMicken stated that before he issued the pre-determination Hearing Notice, he had "consult[ed] with Deputy Chief Lieb and Chief Dale, laying out the facts, providing his recommendation and [receiving] their approval." App.IV/1026. The CSC decision also states that "the relevant Utah statutes, and Utah case law interpreting those statutes, as well as the applicable laws and ordinances of Salt Lake City and the CSC Rules, all provide that it is the department head or chief of a public safety department who has the authority to" demote Ms. Ellis, further cementing Dale's role in this decision. App.IV/1023. And Lieb testified that ultimately it was the "fire chief" who made demotion decisions. App.IV/1125.

The CSC decision contains additional evidence of coordination. In January 2016, Lieb saw Ms. Ellis give a presentation at a fire training conference and took no issue with her doing so; then, two months later, Lieb signed off (along with Dale and McMicken) on using that presentation as a basis to demote Ms. Ellis. App.IV/1058–1059. On October 16, 2015, Lieb (together with McMicken) called and texted Ms. Ellis's department issued phone, then several months later Lieb signed off (along with Dale and McMicken) on using the fact that Ms. Ellis had missed those calls and texts to claim that she had been unreachable and unlocatable from October 15 until October 17 and should therefore be demoted. App.IV/1062–1063. In fact, during that period of time, Ms. Ellis had been at a training about which she had emailed McMicken; she emailed and fielded phone calls from a number of fire department personnel (including emails with McMicken on October 16); and when she was not at the training, she was available at the office. App.IV/1064.

Lieb participated in what the CSC justifiably found "to be an attempt to manufacture misconduct and alleged failure of performance to justify the

disciplinary action, when there were no performance issues." App.IV/1059. The evidence in the record would also justify a reasonable jury in so finding. This court should reject the government's argument that the evidence blatantly contradicts the district court's findings regarding Lieb.

The defendants are also wrong to argue that the district judge's findings regarding Dale were blatantly contradicted by the record. D.Br.27–28. The defendants argue that the district judge erred in crediting Ms. Ellis's testimony about Dale's "tampon" comment because that comment is absent from a recording that captured part of a conversation during which it was made. But there is no evidence that the recording captured the complete conversation. And when she responded to her written warning in February 2014, Ms. Ellis reported that Dale had "made derogatory comments about my ambition, suggested throwing tampons at people who are grumpy and made some comment about doing something like a girl in my formal meeting with Jennifer Sykes." App.III/755. Ms. Ellis's testimony is corroborated, not contradicted, so the defendants' argument fails.

58

The defendants' next "blatant contradiction" argument fails because it relies on too narrow a view of the record. According to the defendants, recordings during which Dale did not encourage Ms. Ellis to treat female subordinates more poorly than she treated male subordinates blatantly contradict Ms. Ellis's testimony that, on other occasions, Dale did provide such encouragements D.Br.28. But an audio recording capturing "only part of the incident[s]" on which a plaintiff bases her claims does not blatantly contradict testimony about what happened during parts of the incidents that went unrecorded. *York v. City of Las Cruces*, 523 F.3d 1205, 1210–1211(10thCir.2008). The defendants' argument is contrary to *York.*

The defendants misplace reliance on *Ford*. D.Br.29. In that case, the plaintiff "offered deposition testimony of only one specific occasion" of racially discriminatory language, and otherwise made "vague and conclusory" claims about the "use of racial slurs." 222 F.3d at 777–778. *Ford* says nothing about the blatant-contradiction doctrine here at issue, and offers no support for the contention that a district judge's factual findings in support of a summary-judgment denial are challengeable on interlocutory

review on account of the findings' vagueness. There is no support in the case law for the defendants' incorrect claim that such findings may be vague enough to bring them within the jurisdiction of this court's qualified-immunity interlocutory review.

Moreover, Ms. Ellis offered testimony regarding far more than "one specific occasion" of gender discrimination, and the challenged findings are supported by specific statements made by other witnesses about the gender discrimination they witnessed App.IV/1194, App.V/1203–1204, 1208, 1356–1363. Consequently, the defendants' argument fails.

The defendants' arguments are a poor fit for the narrow exception the Court articulated in *Morris*. In *Morris*, the district judge had found that the plaintiff had "remained in control of his vehicle, slowed for turns and intersections, and typically used his indicators for turns," but a video of the "events in question" showed that the plaintiff had "rac[ed] down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. . . . swerve[d] around more than a dozen other cars, cross[ed] the double-yellow line, and force[d] cars traveling in both directions to their respective

shoulders to avoid being hit." *Morris*, 550 U.S. at 379. Unlike *Scott*, this record has testimony and statements from upwards of a dozen people supporting the district judge's findings that the defendants engaged in harassing conduct over the course of three years. The defendants are wrong to claim that the four recordings in the record contradict any of those findings.

> b.  The Defendants' Title VII and *Monell* Claims Fail

>> i.  The Defendants' Pendent-Jurisdiction Contentions Regarding the Title VII and *Monell* Claims Fail to Rise to the Level of Appellate Argument

This court "routinely [] decline[s] to consider arguments that . . . are inadequately presented[] in an appellant's opening brief." *Bronson v. Swensen*, 500 F.3d 1099, 1104(10thCir.2007)(collecting cases). In addressing their Title VII and *Monell* claims, the defendants cite no cases discussing the requirements of pendent jurisdiction, and they do not contend that those requirements are satisfied here. D.Br. 37, 44–45. Earlier in their brief, the defendants cite one pendent-jurisdiction case, but they fail to mention that this case disfavors pendent jurisdiction.  See *Cox v. Glanz*, 800 F.3d 1231,

1255–1256(10thCir.2015)("We generally will allow 'a suit against the county to proceed when immunity based on a lack of clearly established law shields the individual defendants.")(quotations, alterations, and citation omitted). The defendants' brief falls short of requiring this court to consider this issue.

      ii.  The Title VII and *Monell* Claims against the City are not Inextricably Intertwined with the Claims against the Individual Defendants

The defendants' pendent-jurisdiction claim also fail when they are considered on their merits. The only pendent-jurisdiction exception to which the defendants point is the "inextricably intertwined" exception. A purportedly pendent claim is only inextricably intertwined with a collaterally appealed claim when "appellate resolution of the collateral appeal **<u>necessarily</u>** resolves the pendent claim as well." *Moore v. City of Wynnewood*, 57 F.3d 924, 930(10thCir.1995)(emphasis in original).

Even if there were grounds on which this court could resolve the qualified-immunity issue in the defendants' favor (which there are not), this court would be able to do so "on the clearly-established-law prong of

qualified immunity." *Cox*, 800 F.3d at 1256. Such a resolution would "**not** turn on issues inextricably intertwined with those implicated by an official-capacity claim arising out of the same facts." *Id.* (emphasis in original). Thus, appellate resolution of the qualified immunity arguments does not necessarily resolve the claims over which the defendants ask this court to exercise pendent jurisdiction, so this court should reject that request.

      iii.  The Title VII and *Monell* Claims against the City Succeed on their Merits

Turning to the merits of the summary-judgment arguments over which the defendants ask this court to exercise pendent jurisdiction, they are lacking. To support their claim that the district judge should have summarily adjudicated Ms. Ellis's Title VII and Section 1983 claims against the city, the defendants do no more than to incorporate their arguments that no reasonable jury could find that the defendants subjected Ms. Ellis to a hostile work environment based on the record in this case. For the reasons articulated at pp. 25–53, those arguments fail.

c.  The Defendants' Evidentiary Claims Fail

    i. The Defendants' Waived Evidentiary Claims are not Inextricably Intertwined with the Claims against the Individual Defendants

The question of whether a "district court erred when it accepted and relied upon inadmissible hearsay evidence in its denial of their motion for summary judgment" is not "inextricably intertwined" with the district judge's finding that individual defendants violated clearly established constitutional rights. *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1317(10thCir.1999). Thus, the defendants' arguments about the CSC decision's admissibility are beyond the scope of this court's jurisdiction, and this court should reject those arguments for that reason.

By failing to make them below, the defendants waived the evidentiary arguments they are now making. In their papers below, the defendants merely made a "blanket assertion, with no supporting citations or argument, that the [CSC] report is inadmissible hearsay." *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1180 n. 3(10thCir.2007). At argument before the

district court, the defendants did not make any hearsay arguments regarding the CSC decision, and stated "we do object to the admission of the CSC decision in whole." App.VI/1649. The defendants never mentioned Fed. R. Evid. 803(8) or 403 in their arguments before the district judge. Thus, they waived their argument that the CSC decision is not a public record, and that its probative value is substantially outweighed by its potential to cause unfair prejudice. App.V/1427–1428; App.VI/ 1649–1651, 1670–1675

    ii.  The District Court did not Abuse its Discretion by ruling that the CSC Decision was Admissible under Fed. R. Evid. 803(8)

This court reviews a district judge's "decision to admit evidence . . . for an abuse of discretion." *United States v. The Boeing Co.*, 825 F.3d 1138, 1145–1146(10thCir.2016). The reviewing court "will not reverse unless the district court's decision exceeded the bounds of permissible choice in the circumstances or was arbitrary, capricious or whimsical." *United States v. Rodella*, 804 F.3d 1317, 1329(10thCir.2015).

Even if the court reaches the merits of the defendants' evidentiary arguments, it should nonetheless reject them. Regarding the hearsay argument, the defendants' only claim was that evidence that Ms. Ellis was friends with one of the commission members conclusively establishes that the CSC decision was untrustworthy under rule 803(8). But "the trial court is the first and best judge of whether tendered evidence meets the standard of trustworthiness and reliability." *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821(10thCir.1981)(quotation omitted). Thus, the district court had ample discretion to find that the defendants' argument about bias did no render the CSC decision untrustworthy under Fed.R.Evid. 803(8).

In a manner that does not rise to the level of appellate argument, *Bronson*, 500 F.3d at 1104, the defendants state that the CSC decision contains double hearsay. The defendants do not point to any such double hearsay. Insofar as the defendants are referring to instances where the CSC decision recounts testimony given before the commission, the defendants' argument fails. Much like deposition testimony, the CSC testimony could be "presented in a form that would be admissible in evidence" at trial.

Fed.R.Civ.P. 56(c)(2). As the district judge recognized, "whatever those witnesses appeared and said, it resulted in a decision that was adverse to the City. And . . . those same witnesses [could] show up at trial and say what they said then to a jury in that box . . . ." App.VI/1650. Thus, there is no double hearsay problem.

Rather than supporting the defendants' restrictive reading of Fed.R.Evid. 803(8), the Supreme Court has described such a narrow reading of that rule as being "contrary to the liberal thrust of the Federal Rules." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169(1988). And as for the two cases the defendants rely on from other circuits, neither of them has anything to do with a district court's discretion to find a public record to be trustworthy under Fed.R.Evid. 803(8) notwithstanding an alleged[22] friendship between

---

[22]    Aside from McMicken's self-serving deposition testimony that Ms. Ellis was friends with one of the commission members, the defendants point to no record evidence to support the existence of such a friendship. D.Br.17, n. 53(citing App.V/1299).

one of the record's authors and a party.[23] Bereft of support in the case law, the defendants' argument fails.

The defendants also argue that the district court should have excluded the CSC decision under Fed.R.Evi. 403. This court has recognized that, "exclusion of relevant evidence under rule 403 is an extraordinary remedy to be used sparingly," *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155(10thCir.1985)(quotation omitted), and that, "[b]ecause of its familiarity with the evidence, the trial judge is in a better position to make" a decision under rule 403, and this court "will overturn [the district judge's] decision only if it represents a manifest abuse of discretion." *United States v. Young*, 952 F.2d 1252, 1258(10thCir.1991).

The defendants cite to cases that do not involve the argument they are making. One case involves a district judge's decision being overturned based

---

[23]    D.Br.17, 19, citing *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343(3d Cir. 2002)("[N]one of the aforementioned trustworthiness considerations have been invoked in this case. . . ."), and *United States v. Guardado-Diaz*, 737 F. App'x 119, 122(4thCir.2018)("The fact that most of the testifying officials did not specifically remember Guardado-Diaz or the warrant does not undermine the warrant's trustworthiness.").

on its pre-rules-of-evidence exclusion of an EEOC report from evidence. See

*Smith v. Universal Servs., Inc.*, 454 F.2d 154, 160–161(5thCir.1972). The others

involve district judges' exclusions of EEOC reports being upheld on

appeal.[24] None of these cases involve summary judgment decisions being

overturned based on a waived argument that the district judge should have

excluded a public record under rule 403. The defendants' evidentiary

arguments fail because it lacks legal and factual support.

## CONCLUSION

For the foregoing reasons, Ms. Ellis respectfully requests that the court

AFFIRM the district judge's decision denying summary judgment to the

defendants.

---

[24]    *Tuffa v. Flight Servs. & Sys., Inc.*, 644 F.App'x 853, 856(10thCir.2016)(unpublished)(trial judge had discretion to exclude EEOC letter under Rule 403); *Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304, 1310 (8thCir.1984)(same); *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 65 (2d Cir. 1998)(same); *Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 15 (4thCir.1972); *E.E.O.C. v. Ford Motor Co.*, 98 F.3d 1341, 1996 WL 557800 at *11(6thCir.1996) (unpublished)(same).

Respectfully submitted,
The Plaintiff-Appellant,
Martha Ellis,
By her counsel,

_____

Luke Rosseel, Esq. (BBO # 690731)
ROSSEEL LAW
P.O. Box 1136
Berlin, Massachusetts  01503
(508) 471-6459
Luke@ROSSEELLAW.com

*Attorney for Plaintiff-Appellant*
*Marth Ellis*

## CERTIFICATION OF COUNSEL

The undersigned hereby certifies that:

1. This corrected brief complies with the type volume limitation as required by Fed. R. App. P. 32(a)(7)(B), and contains 12,955 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). Further this brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in a proportionally spaced font using Microsoft Word 2010 and in 14-point Palatino Linotype font.

2. Pursuant to Tenth Circuit Local Rule 25.5, all required privacy redactions have been made.

3. Pursuant to Tenth Circuit Local Rule 31.5, the seven (7) copies being submitted to the Clerk's Office are exact copies of the version submitted electronically.

4. This file has been scanned for viruses using Microsoft Defender Antivirus, Security intelligence version 1.407.798.0, last updated April 26, 2024 at 10:15 AM EST.

   DATED: April 29, 2024.

   _____
   Luke Rosseel

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2024 I electronically filed the forgoing Appellee's Corrected Brief in the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system: Katherine Nichols (Katherine.Nichols@slcgov.com).

_____
Luke Rosseel